

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **RANDLE L. JENNINGS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **vs.** } | **CASE NO. 2:07-cv-1593-SLB** |
| } | |
| **LAWSON STATE COMMUNITY** } | |
| **COLLEGE; PERRY WARD,** } | |
| *individually and in his official* } | |
| *capacity as President, Lawson State* } | |
| *Community College*; **BRADLEY** } | |
| **BYRNE,** *in his official capacity as* } | |
| *Chancellor of the Alabama* } | |
| *Department of Postsecondary* } | |
| *Education*; **STEVE JOHNSON,** } | |
| *individually*, } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION

This case is before the court on defendants' Motion for Summary Judgment.  (Doc. 28.)[1]  Plaintiff, Randle L. Jennings, has sued his former employer, defendant Lawson State Community College ("Lawson State" or "LSCC"), and individuals involved with LSCC and/or the decisions at issue, including Dr. Perry Ward, President of Lawson State; Bradley Byrne, Chancellor of Alabama's Department of Post-Secondary Education; Roy W. Johnson, former Chancellor, and Steve Johnson, a former employee of Lawson State – alleging that defendants discriminated against him on the basis of his race and that they

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

retaliated against him for complaining about discrimination, in violation of Title VII, as well as Section 1981 and the Equal Protection Clause, actionable against the defendant through 42 U.S.C. § 1983.[2]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 28), is due to be granted.

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317,

---

[2]In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, plaintiff states:

> Plaintiff voluntarily seeks this Court to withdraw his claim under [42 U.S.C. §] 1985(3) for conspiracy.  In addition, Defendants spend substantial parts of their Brief in Support of Motion for Summary Judgment attempting to defeat Plaintiff's Hostile Work Environment Claim.  However, Plaintiff has never made such a claim and merely makes its case on Race Discrimination and Retaliation under Title VII and § 1981 through § 1983.

(Doc. 41 at 1 n.1.)  Also, at oral argument, plaintiff counsel conceded that plaintiff had no claim against Steve Johnson.

324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id*. at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id*. at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Evans v. Stephens*, 407 F.3d 1272, 1284 (11th Cir. 2005) (Carnes, J., concurring specially) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)).

## II.  <u>STATEMENT OF THE FACTS</u>[3]

### A.  **Employer Lawson State**

Lawson State Community College is a historically-black, two-year college governed by the State of Alabama Board of Education.  (Doc. 40, Ex. 2 at 99 and ex. 20 ¶ 2.)  At the institutional level, the President of LSCC is responsible for the overall

---

[3] As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to the plaintiff, Randle L. Jennings, the non-moving party.  All disputed facts are resolved in his favor, and all reasonable inferences arising from those facts are drawn in his favor.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

administration, supervision, and leadership, and has the ultimate authority for all employment decisions. (*Id.* at 19, 303.) Dr. Perry Ward was President of LSCC during plaintiff's employment. (*Id.* at 7, 17.) Dr. Ward is an African-American male. (*Id.*, ex. 20 ¶ 5.)

The Alabama Department of Post Secondary Education oversees the two-year college system through its Chancellor. (*Id.*, Ex. 3 at 23.) The Chancellor administers the policies of the State Board and makes recommendations regarding the hiring and firing of college presidents; he does not, however, have hiring and firing authority for other employees at the colleges. (*Id.* at 23-24.) Defendant Roy Johnson was the Chancellor of the Alabama Department of Post Secondary Education during plaintiff's employment by LSCC. (*Id.* at 8, 21.) Roy Johnson is a white male. (Doc. 1 ¶ 11.)

**B.     Plaintiff Jennings**

Jennings is an African-American male. (Doc. 40, Ex. 1, ex. 8 at 0002.) He first worked for LSCC in the Fall semester of 2002, as a part-time Instructor of health classes. (*Id.*, Ex. 1 at 87.) Lawson State rehired Jennings in the Fall of 2004, under a two-month contract, to serve as a consultant to the college in the development and re-establishment of its baseball program. (*Id.*, ex. 3.) LSCC extended the consultant contract through December 31, 2004. (*Id.*, Ex. 2, ex. 11 at 00057.) During that same period of time, LSCC employed Jennings as a part-time Instructor. (*Id.* at 57 and ex. 11 at 00050.)

In January of 2005, LSCC hired Jennings on a full-time basis as an Instructor in the Physical Education and Health Department and as Head Baseball Coach. (*Id.* at 61

4

and ex. 11 at 00056.)  Dr. Ward interviewed Jennings and made the hiring decision.  (*Id.* at 61-62.)  This initial contract as Head Baseball Coach ran from January through May 18, 2005, and the second contract ran from August 2005 through May 15, 2006.  (*Id.* at 61, 63.)  As an Instructor, Jennings reported to Eleanor Pitts, an African-American female, and, as the Coach, he reported to Athletic Director John Douglas, an African-American male.  (*Id.* at 66-67.)  Douglas also reported to the Dean of Students, Charlsie Cook, an African-American female.  (*Id.* at 67; *id.*, Ex. 1 at 78-80.)  During his employment, all the coaching positions at LSCC were held by African-Americans.  (*Id.*, Ex. 1 at 80.)

## C.    Steve Johnson–Co-Worker and Comparator

In July or August of 2004, Roy Johnson called Dr. Ward and told him that his son, Steve Johnson, was looking for work in Birmingham; Roy Johnson asked Dr. Ward to meet with his son and to consider him for any vacancy that LSCC might have.  (*Id.*, Ex. 2 at 126; *id.*, Ex. 3 at 54.)  Steve Johnson is a white male.  (*Id.*, Ex. 4, ex. 2 at 000144.)  At that time Roy Johnson did not know that LSCC was considering development of a baseball program.  (*Id.*, Ex. 3 at 64.)  When Roy Johnson asked Dr. Ward to consider hiring Steve Johnson, he made no promises in exchange for a job for his son, and he did not discuss funding for LSCC.  (*Id.*)  Steve Johnson called Dr. Ward and, subsequently, met with him to discuss employment opportunities at LSCC.  (*Id.*, Ex. 2 at 133-35; *id.*, Ex. 3 at 43.)  On September 28, 2004, LSCC hired Steve Johnson, on an eleven month contract as Interim Coordinator of External Programs and Economic Development.  (*Id.*,

5

Ex. 2 at 140; *id*., Ex. 4, ex. 2 at 000147.)  In this position, Steve Johnson was to supervise the construction of the baseball field and to work on adult education programs.  (*Id*., Ex. 4 at 46-47.)

**D.  Baseball Program**

As part of Dr. Ward's vision to reestablish a baseball program, he planned to construct a new baseball field on campus.  (*Id*., Ex. 2 at 96, 127-28.)  LSCC previously had architectural plans submitted by the Dale Fritz Company for the building of a baseball field.  (*Id*. at 96.)  LSCC made a request to the State Board of Education for $400,000 to retrofit its entire athletic/recreational complex, including a new baseball field, a parking lot, and a walking track.  (*Id*. at 127.)  Dr. Ward also intended to ask Jefferson County for the use of their road equipment to help LSCC construct the new baseball field.  (*Id*. at 128; *id*., Ex. 3 at 67.)

In the latter part of 2004, when Roy Johnson visited the campus to see the new technology building, then under construction, he also looked at the site of the new baseball field.  (*Id*., Ex. 2 at 128; *id*., Ex. 3 at 66.)  Jennings and Steve Johnson accompanied Roy Johnson, Dr. Ward, and others to view the site.  (*Id*., Ex. 3 at 66; *id*., Ex. 1 at 84.)  Roy Johnson was a strong advocate for sports programs at all the colleges, and "once [he and Ward] decided to restart [the baseball] program, he wanted to build as fine a baseball facility [as possible]."[4]  (*Id*., Ex. 3 at 67-69.)  LSCC sought bids on the

---

[4]Plaintiff disputes that Dr. Ward and Roy Johnson had the decision-making authority to move forward with the new field.  (*See* doc. 29 at 6; doc. 41 at 6.)

6

project and construction began in January 2005.  (*Id.* at 70, 72, 76; *id.*, Ex. 1 at 92.)

LSCC used unexpended plant funds it had accumulated, and Roy Johnson got additional

funding approved by the State Board of Education.  (*Id.*, Ex. 2 at 96-97, 129; *id.*, Ex. 3 at

73-75.)

**E.     Plaintiff and Steve Johnson's Respective Responsibilities and Working
        Relationship**

LSCC did not field a baseball team during Jennings's initial contract as Head

Coach; Jennings's responsibilities at that time included making contacts and recruiting

high school players.  (*Id.*, Ex. 1 at 93-94.)  Jennings had no responsibility for the ongoing

construction of the field, although he had some input.  (*Id.* at 92, 95.)

During Steve Johnson's initial contract term, Fall 2004, in addition to his work in

the adult education "Outreach Program," he began performing additional duties to assist

the Director of Facilities, Nick Shields ("Shields").  (*Id.*, Ex. 4 at 50-51; *id.*, Ex. 6 at 30-

32, 50.)  The college had several major construction projects at that time, including the

baseball field, and Shields was seeking assistance.  (*Id.*, Ex. 6 at 32.)  Steve Johnson was

given responsibility for groundskeeping, housekeeping, maintenance, transportation, and

shipping and receiving.  (*Id.* at 41; *Id.*, Ex. 4 at 50-51.)  As part of his duties, Steve

Johnson provided oversight of the architects and contractors involved in the baseball field

project, and he coordinated the construction with other school activities.  (*Id.*, Ex. 4 at 93;

*id.*, Ex. 6 at 50.)  However, Shields made all technical decisions.  (*Id.*, Ex. 6 at 50.)

In March 2005, at Shields's request, LSCC created and posted a new position for "Director of Special Projects." (*Id.* at 32; *id.*, Ex. 2 at 172-73.) Steve Johnson applied for the position and, after a formal interview, he was selected for the position. (*Id.*, Ex. 6 at 86; *Id.*, Ex. 4 at 105-06.) In the new position, Steve Johnson continued to perform duties related to groundskeeping, maintenance, shipping and receiving, and transportation, as well as construction of the baseball field. (*Id.*, Ex. 6 at 41; *id.*, Ex. 4 at 110.) He did not supervise Jennings. (*Id.*, Ex. 1 at 178.)

LSCC first fielded a baseball team in Fall of 2005. (*Id.* at 96.) The team practiced and played off-campus because the new field had not been completed. (*Id.* at 97-98, 151.) The field was ready for use in Spring of 2006. (*Id.* at 97.) Steve Johnson remained responsible for maintaining the baseball field and his job required him to be there every day. (*Id.*, Ex. 2 at 112, 307; *id.*, Ex. 6 at 52.)

During this time, plaintiff and Steve Johnson began to have conflicts. On numerous occasions, Steve Johnson refused to unlock the gates to allow the team on the field until Jennings was present, and he told the players "y'all aren't going to tear up what we've tried to establish here." (Doc. 40, Ex. 1 at 114.) Jennings was offended by Steve Johnson's actions and his use of the word "y'all"[5] because most of the players were African-American. (*Id.* at 114-15.) Additionally, Steve Johnson told some of the African-American "y'all don't play this game." (*Id.* at 128.) Jennings admits that "y'all"

---

[5]"Y'all" is a variant of "you all," which Merriam-Webster.com defines as: "chiefly Southern: you — usually used in addressing two or more persons." http://www.merriam-webster.com/dictionary/you-all

is commonly used when addressing both African-Americans and whites.  (*Id.* at 117.)

However, he testified that, when his players related these comments to him, he "made a

bee line to consult with Dr. Ward about what was going on with the attitude that Steve

was displaying towards [plaintiff] and [his players, and it had primarily to do with . . .

race." (*Id.* at 129.)

   The baseball team had black players and white players; however, Steve Johnson

told Jennings he would need to get some players from "over the mountain," (*id.*, Ex. 1 at

61, 72-73, 117), a reference to the cities on the southern side of Red Mountain, including

Mountain Brooks, Vestavia Hills, and Hoover, which are predominately white.  Jennings

admits the over-the-mountain high schools have more quality baseball players than the

Birmingham city schools.  (*Id.* at72-73.)  Dr. Ward asked Jennings if he had recruited any

white players.  (*Id.*, Ex. 2 at 98-99.)  According to Dr. Ward "[LCSS is] a historically

black college . . . [but he has] tried to encourage all of [its] coaches . . . to recruit . . .

people who are not of the African-American descent."  (*Id.* at 99.)

   Jennings also alleges that Steve Johnson directed others to engage in

discriminatory actions.  At games, it is customary throughout the Community College

System for players to be identified when they come to bat by the playing of a particular

theme song, selected by the player.  (*Id.*, Ex. 1 at 118.)  Harold Denard was responsible

for sound at games.  (*Id.* at 119.)  Jennings testified that Denard told him that Steve

Johnson had instructed Denard not to play "jungle music" during the games.[6]  (*Id.* at 118-19.)  Jennings testified Denard told him that Steve Johnson had said, "You know, you all might play it as loud as you want to in your, you know what, cars, he used explicit terms, but you're not going to play it out here on this field."  (*Id.* at 118.)  When Jennings confronted Steve Johnson about these statements, he said that Johnson said, "[T]hat kind of music is not going to be played up in that press box."  (*Id.* at 119.)  The players were not allowed their theme songs; Steve Johnson told Harold to "pick out another selection of music."  (*Id.* at 120.)  Steve Johnson denies making those statements or using the term "jungle music," and he testified that his comments related to the music were made out of consideration for the audience and to prohibit songs containing vulgarity from being played.  (*Id.*, Ex. 4 at 132-34.)

Also, Jennings and Steve Johnson had a conflict over the height of the pitching mound.  Jennings wanted to raise the mound in a fashion similar to that of other schools, so that his players would not be at a competitive disadvantage.  (*Id.*, Ex. 1 at 121-22.)  The mound had been built with a "soft surface" and the rubber inside the mound had become exposed; thus Jennings wanted to repair and build up the mound.  (*Id.* at 124.)  Jennings claims that Shields verified and reported to Dr. Ward that the mound was breaking down.  (*Id.* at 124-25.)  Nevertheless, initially, Ward, Shields, and Steve

---

[6]Defendants dispute this testimony and contend that the court should not consider it because it is inadmissible hearsay.

Johnson told Jennings that the field was not going to be modified from the plan's specifications.  (*Id.*, Ex. 6 at 52-53; *id.*, Ex. 1 at 124; *id.*, Ex. 4 at 123.)

Jennings and Steve Johnson got into a heated argument on the field, which prompted Shields to call campus security.  (*Id.*, Ex. 4 at 119-20; *id.*, Ex. 6 at 55-56.) Jennings testified that, following a ball game, he called Shields over to look at the mound. Steve Johnson came onto the field and he and Jennings engaged in a "verbal altercation about the true essence of what [their disagreements were really about]," which the court assumes their argument became about race. (*Id.*, Ex. 1 at 187-88.)  In contrast, Steve Johnson testified that Jennings made derogatory racial comments, which included asking Shields "why [Steve Johnson] is over here in our house anyway, he [does not] belong here."  (*Id.*, Ex. 4 at 119.)  Shields testified that he was in the outfield and did not hear what Jennings said.  (*Id.*, Ex. 6 at 55.)

Dr. Ward met with Jennings and Steve Johnson to discuss "the issue with the baseball field."  (*Id.*, Ex. 2 at 305-06.)  Dr. Ward told them that they had separate responsibilities – Jennings was to "coach the baseball team," and Steve Johnson was to "monitor and maintain the field."  (*Id.* at 305-07.)  After this meeting, Dr. Ward thought the problems between the two men were resolved.  (*Id.* at 307.)

LSCC suspended Jennings at the end of March 2006, shortly after the incident on the field and his meeting with Dr. Ward and Steve Johnson.  (*Id.* at 305-06; *id.*, Ex. 1 at 188.)

**F.      Snead State Incident**

In the Spring of 2006, Dr. Ward received an email from Al Cox, the Commissioner

of the Alabama Community College Conference, regarding complaints lodged by the

umpires who had officiated LSCC's game at Snead State.[7]  (*Id*., Ex. 2 at 222-31 and ex.

15.)  The umpires complained (1) that LSCC had arrived late for the game and had

refused to play a double header; (2) that one of the umpires was hit by a rock that he

believed came from the LSCC dugout; and (3) after the game an "un-uniformed LSCC

player" told the umpires, "you sucked, you were fucking horrible, you need to find a new

fucking job."  (*Id*., ex. 15.)

Jennings testified that the "tardiness" was not his fault because Dr. Ward delayed

him by instructing him to remain on campus to correct some computer scheduling errors

that morning.  (*Id*., Ex. 1 at 138-39.)  Jennings also points out that he and the coach at

Snead State agreed that they did not have enough time to play a double header.  (*Id*.)

There has been no identification of the person, whether it was a player or a student, who

threw the rock.  (*Id*., Ex. 2 at 227-28.)

**G.      Jennings's Suspension**

On March 29, 2006, Dr. Ward placed Jennings on administrative leave with pay.

(Doc. 40, Ex. 2, ex. 21, Suspension Letter.)  Dr. Ward's hand delivered suspension letter

---

[7]The email reflects that it was sent by Mark Lewis, addressed to Gary D. Head, and
forwarded to "Homestead."  (doc. 40, Ex. 1, email, ex. 15.)  Dr. Ward does not know the
named individuals or who is referenced by "Homestead."  (Doc. 40, Ex. 2 at 229-231.)
Dr. Ward is "not sure how [he] got it," but "think[s] it came from Commissioner Cox."
(*Id*.)

stated that leave was effective immediately and would continue "until the College . . . had the opportunity to investigate alleged activities that occurred at a baseball game at Snead Community College on March 16, 2006." (*Id.*)  In his letter, Dr. Ward stated that he had suspended Jennings "because of the abundance of problems and issues that the college was having . . . related to Coach Jennings." (*Id.*, Ex. 2 at 198-99.)  He enumerated the following specific reasons for the suspension: (1) Jennings permitted Wenonah High School to play on the field despite a directive by Dr. Ward not to do so, (*id.* at 199); (2) Jennings gave access to a LSCC credit card and its pin number to some players, among them his son, (*id.* at 200-02); (3) "Jennings order[ed] items for the baseball team without proper purchase requisitions being filed," (*id.* at 210); (4) Jennings was slow to turn in receipts for team expenditures, (*id.* at 218-20); (5) Jennings permitted academically ineligible players to play at games, (*id.* at 234); and (6) Jennings was unable to control his player's use of profanity on the school's bus, (*id.* at 259-60).

H.     **Stated Reasons for Suspension**

       1. **Field Use by Others**

       Because LSCC had adopted Wenonah High School, as part of the Adopt-a-School Program, the high school had used the LSCC ball field prior to its renovation. (*Id.*, Ex. 2 at 102.)  After construction of the new field, Dr. Ward testified that he had instructed Shields and Jennings that no outside teams were to use the field until it had been "turned over" and certified as complete. (*Id.* at 104-07.)  While Jennings did not have the authority to schedule games, he was under the impression from Dr. Ward that he was to

"find several dates" for limited use of the field by Wenonah because LSCC valued the community relationship.  (*Id*. at 108, *id.*, Ex. 1 at 153-55.)  Following Wenonah's use of the field, Dr. Ward confronted Jennings about his "insubordination."  (*Id*., Ex. 2 at 117-18.)

### 2. Credit Card Use

In November or December of 2005, Shields and Steve Johnson discovered irregularities with the use of college vehicles and a gas credit card issued to Jennings. (*Id*., Ex. 6 at 14-16; *id.*, Ex. 4 at 125 and ex. 3.)  Specifically, they noted a charge made out of state and other charges made during times when the vehicles should not have been checked out.  (*Id.*, Ex. 6 at 14-15.)  They reported the problem to Vice-President Sharon Crews in the business office.  (*Id*. at 18-19; *id*., Ex. 4 at 126.)  Jennings ultimately acknowledged that he had given his pin number to others to use and expressed, in a letter to LSCC, that he "took full responsibility for the unethical use of these privileges."  (*Id*., Ex. 1 at 148-49 and ex. 5; *id.*, Ex. 6 at 16; *id.*, Ex. 4 at 128.)  Jennings offered to pay full restitution for the gas purchases, but Dr. Ward never required him to reimburse LSCC. (*Id*., Ex. 2 at 204-07; *id.*, Ex. 1, ex. 5.)  Dr. Ward did not reprimand Jennings regarding the issue, although he did speak with Crews out of concern the school might be audited. (*Id*., Ex. 2 at 206-07.)

### 3. Equipment Orders

In order for a coach to obtain equipment, he must go through several requisition steps.  (*Id*., Ex. 7 at 36.)  Crews reported to Dr. Ward that Jennings had ordered team

uniforms without following proper procedures.  (*Id*., Ex. 2 at 210.)  In a meeting with Dr.
Ward and Jennings, Crews became "uncontrollably angry" and "visibly upset" with
Jennings because she believed he was being untruthful.  (*Id.* at 211-12.)

The parties dispute whether Jennings had followed protocol.  Internal memoranda
suggest Jennings properly communicated with Cook regarding purchases; however, Cook
testified that "we had some problems getting information in a timely manner for the bids
or to get the process moving."  (*Id*., Ex. 7 at 39 and exs. 33 and 34.)  Dr. Ward does not
suggest that Jennings misappropriated money, just that he had "called [vendors] directly
and placed the order."  (*Id*., Ex. 2 at 215.)

### 4.  Scheduling Irregularities

The Spring schedule on the National Junior College Athletic Association
("NJCAA") conference website showed 88 games scheduled for LSCC; the rules allowed
teams to play only 56 games.  (*Id*. at 337-38.)  The parties dispute the reason for the
irregularity.  Dr. Ward and Douglas contend that Jennings provided erroneous
information, albeit unintentionally.  (*Id.; id*., Ex. 5 at 81-84.)  Jennings claims that any
problems related to posting the schedule were due to a computer malfunction, and that he
had made the necessary corrections.  (*Id*., Ex. 1 at 138; *id.*, Ex. 5 at 81-84.)

### 5.  Player Eligibility and Cook Investigation

The parties dispute the exact procedures used to insure that players meet NJCAA
eligibility requirements.  Jennings claims that, as Head Coach, he was responsible for
submitting the names and high school transcripts of the players on his roster to the

Athletic Department and the Registrar.  (*Id*., Ex. 1 at 225.)  According to Jennings, those offices were responsible both for checking the eligibility of all players in accordance with NJCAA rules and for submitting the roster to the NJCAA for clearance.  (*Id*.)  Roy Johnson testified that the head coach bears primary responsibility for information gathering and eligibility determinations.  (*Id*., Ex. 3 at 90-94.)  Dr. Ward testified that a spreadsheet type roster, prepared in a collective effort with the "coach getting athletic information" and the "Registrar's office getting the academic information," is submitted to "the National office."  (*Id*., Ex. 2 at 241-42.)

The parties further dispute whether Jennings provided all of the eligibility information to Athletic Director Douglas in a timely manner.  (*Id*., Ex. 5 at 47-48; *id.*, Ex. 7, ex.32; *id.*, Ex. 8 at 7-11, ex. 45 at 001036, ex. 48 at 000939.)  Because Cook, the Dean of Students, was concerned about the eligibility of players, she held a meeting with Jennings in February 2006.  (*Id*., Ex. 7 at 70-75 and ex. 39.)  Cook testified that Jennings had told her that she was "picking on the students and didn't want to help them stay in school and play ball," and that Jennings had walked out of her office and slammed the door.  (*Id.* at 75-77.)

Cook's handwritten notes from the meeting reflect that the meeting "did not go over well" and that she intended to request another meeting that would include Douglas; she sent her notes to Dr. Ward and Crews.  (*Id*., ex. 39.)  Cook determined that there were players on the baseball team that had not been submitted on the eligibility list, and she told Dr. Ward.  (*Id.*, Ex. 7 at  96-98.)  On March 30, 2006, the day after plaintiff's

suspension, Cook submitted a memorandum to Dr. Ward documenting her concerns regarding the players' eligibility because, although Dr. Ward knew "there were problems and issues with eligibility, [he] didn't know the breadth and depth of it" until Jennings was placed on leave.  (*Id.* at 101; *id.*, Ex. 2 at 258 and exs. 17 and 21; *id.*, Ex. 8, exs. 45 and 48.)

During the suspension period, Cook found that five players that had not been submitted on the eligibility list to the NJCAA had played in games for LSCC.  (*Id.*, Ex. 7 at 96, 136-38 and ex. 43; *id.*, Ex. 2, ex. 18.)  Jennings testified that Cook had refused to sign a clearance for the players so he sought instruction from Douglas about how to proceed.  (*Id.*, Ex. 1 at 229-31.)  Douglas initially responded that Jennings should not allow the players in question to play; however, Douglas and Pitts "told Jennings each one of those boys . . . were eligible and that [he] was allowed to play them."  (*Id.*)

LSCC self-reported the rules violation to the NJCAA on April 21, 2006.  (*Id.*, Ex. 8 at 107-08 and ex. 42.)  Upon conclusion of its investigation, the NJCAA wrote LSCC and stated: "At this time our office will not require Lawson State to forfeit the games where the five student-athletes participated before their eligibility was submitted. However, if this situation occurs again in the future, all games must be forfeited where the student-athletes participated without having their eligibility submitted."  (*Id.*, Ex. 5, ex. 29.)  The NJCAA letter also noted: "The five student-athletes involved in this case were all academically eligible for competition for the 2006 spring baseball season."  (*Id.*)

17

### 6.  Play Irregularities

The parties dispute whether Jennings cancelled an LSCC home game, scheduled against Calhoun Community College on February 26, 2006, because the field was too wet.  (*Id*., Ex. 1 at 146; *id*., Ex. 5, ex. 27.)  Douglas testified that Jennings refused to play the game at an alternate location, and that the coach from Calhoun College had discovered later that Lawson State had practiced on the field on the day of the game.  (*Id*., Ex. 5, ex. 27.)  After Jennings's suspension, Cook directed Douglas to contact Calhoun's coach about the February 26, 2006, game cancellation and to "document the conversation."  (*Id*., Ex. 5 at 10-11.)  Douglas's note is dated April 6, 2006.  (*Id*., Ex. 5, ex. 27.)  Jennings testified that he did not cancel the game and the record of games played shows that Lawson State had played two games against Calhoun on February 26, 2009. (*Id*., Ex. 2, ex. 23 at 0060-0061.)

### 7.  Complaint from Bus Driver

Dr. Ward also received reports from the bus driver, Clarence Jones, that the baseball players were disrespectful and regularly used profanity on the school bus.  (*Id*., Ex. 2 at 259.)  Dr. Ward claims that despite Jennings's attempts, he was unable to control the behavior of his young baseball players.  (*Id.* at 260.)

## I.    Jennings's Non-Renewal

Dr. Ward made the decision not to renew Jennings's contract with LSCC.  (*Id.* at 303 and ex. 11 at 00074.)  In Jennings's termination letter, dated April 17, 2006, he stated, "This notice of non-renewal is not intended to be, and should not be construed as,

18

a disciplinary action of any type.  We are merely not renewing your current contract."
(*Id.*)  Dr. Ward did not meet with Jennings during the period of his suspension; he met
with staff, which he considered to be equivalent to "meeting with Coach Jennings."  (*Id.*
at 264-65.)  While Dr. Ward personally spoke with Jennings about not allowing Wenonah
High School to use the field, he is not aware if Cook ever met with Jennings regarding the
player eligibility issue and he could not remember if anyone had met with Jennings about
the incident at Snead State.  (*Id. at* 268-70.)  Dr. Ward never issued a written disciplinary
action to Jennings for any of the alleged incidents and Jennings had received satisfactory
evaluations during his employment.  (*Id.* at 121 and exs. 24, 25.)

Roy Johnson testified he did not know why Dr. Ward did not renew Jennings's
contract.  (*Id.*, Ex. 3 at 111-12.)  Steve Johnson did not tell Dr. Ward to terminate
Jennings.  (*Id.*, Ex. 4 at 204.)  However, Dr. Ward had questioned Steve Johnson about
the incident with Denard and he had told Steve Johnson that Jennings had accused him of
race discrimination.  (*Id.* at 156-57.)  Douglas maintained "a pretty good file of a lot of
things;" however, he was never asked to provide information related to Jennings.  (*Id.*,
Ex. 5 at 61-62.)  He did not evaluate Jennings's performance.  (*Id.* at 62.)

Jennings testified that he does not believe that Dr. Ward or Cook did not renew his
contract because of his race.  (*Id.*, Ex. 1 at 79.)  However, he contends that Dr. Ward
wanted to have a baseball program in order to feel a "part of the mix of other community
college presidents," and that replacing Jennings with a white coach meant that race "had
to be at the forefront of his mind and not the back."  (*Id.* at 221-25.)

19

Jennings was replaced by Barry Dean, a white male.  (*Id.*, Ex. 2 at 297.)

**J.      Jennings's Complaints of Race Discrimination**

On March 19, 2006, ten days before his suspension, Jennings sent Dr. Ward an email regarding "the current condition of LSCC baseball."  (*Id.*, Ex. 1, ex. 6.)  Jennings outlined his frustration with LSCC policy, personnel, and certain job limitations, and concluded by stating:

> "I thank[ ] you for the opportunity, but it is becoming apparent I'm not the man to integrate the Good Ole Boy System, in establishing a presence by handling America's Original Game of Baseball!  It is going to be difficult for any **African-American Coach** to accomplish success under these circumstances."

(*Id.*) (emphasis in original)

Dr. Ward denies that Jennings made any complaints related to Steve Johnson or race.  (*Id.*, Ex. 2 at 182-83.)  Dr. Ward does acknowledge that Jennings complained about the field and the pitcher's mound in particular.  (*Id.*)  Roy Johnson had no knowledge that Jennings had made any complaints about Steve Johnson.  (*Id.*, Ex. 3 at 113.)  Douglas, however, recalls that Jennings complained to him that Steve Johnson "was on his back."  (*Id.*, Ex. 5 at 66.)

**K.      Co-Worker and Comparator Steve Johnson–Suspension and Termination**

In August 2006, Dr. Ward read a newspaper article that stated Steve Johnson had received payments from a contractor performing work on a project for LSCC.  (*Id.*, Ex. 2 at 165-66.)  Dr. Ward immediately called Steve Johnson to his office to question him about the matter, and, when Johnson acknowledged receiving the payments, Dr. Ward

immediately placed him on administrative leave with pay.  (*Id.*)  LSCC sought assistance from legal counsel to investigate the allegations related to Steve Johnson.  (*Id.* at 160-64.) In February 2007, at the conclusion of the investigation, Dr. Ward terminated Steve Johnson. (*Id.*)

### III.   DISCUSSION

Plaintiff's remaining claims include: (1) Title VII claims of race discrimination and retaliation against Lawson State;  (2) Section 1983 claims of race discrimination and retaliation in violation of the Equal Protection Clause and Section 1981 against Dr. Ward, in his individual capacity and in his official capacity as President of LSCC, and Byrne, in his official capacity as Chancellor of Alabama's Department of Post-Secondary Education.  Because Jennings has withdrawn conspiracy claims arising under section 1985(3), defendants are entitled to judgment as a matter of law as to those claims.

## A.  TITLE VII CLAIMS

### 1.      Race Discrimination

"Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "[T]he plaintiff bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence" for any claim

brought under Title VII. *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (quotation omitted).

Absent direct evidence, a plaintiff may rely upon circumstantial evidence to prove discriminatory intent under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Crawford*, 529 F.3d at 975-76. "Under this framework, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id*. at 976 (quoting *McDonnell Douglas*, 411 U.S. at 802). "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) [he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside her class more favorably." *Id*. at 970 (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (*per curiam*)).

The employer's burden to articulate a legitimate, non-discriminatory reason is very light: "the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). If the employer is able to meet this burden, the plaintiff is afforded the opportunity to demonstrate that the employer's proffered reason for the adverse employment action is merely a pretext for discrimination. *Holifield*, 115 F.3d at 1565 (citing *McDonnell Douglas*, 411 U.S. at 804). Pretext can be shown either by

directly persuading a court that discriminatory motive more likely motivated the employer or by indirectly demonstrating the provided reason was unworthy of credence.  *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983).  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait . . . actually motivated the employer's decision."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000)(quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993))(internal quotations omitted).

Jennings's race discrimination claim is based on LSCC's decision to suspend him and, thereafter, to not renew his contract.

### a.  Plaintiff's Deposition Testimony that Ward was not motivated by his race.

The parties do not dispute that Dr. Ward was the sole decision-maker with respect to these actions.  (*See* doc. 29 at 16; doc. 41 at 26.)  Jennings testified, unequivocally, that he did not believe that "Dr. Ward made the decision not to renew [his] contract because [he is] black."  (Doc. 40, Ex. 1 at 79.)  Defendants argue that "Jennings's testimony . . . should end the analysis of the race discrimination claim."  (Doc. 29 at 19.)  The court disagrees.  Jennings testified that Dr. Ward wanted a white baseball coach because it was

"better that the program go toward a white coach, a white presence, because that's what they basically witnessed throughout the Alabama Community College System."  (Doc. 40, Ex. 1 at 223.)  Viewing the evidence in the light most favorable to plaintiff, the court finds that plaintiff's testimony is inconsistent and that inconsistency must be resolved in plaintiff's favor on this Motion for Summary Judgment.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986).

### b.  Prima Facie Case

In this circuit –

> Where direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [he] belongs to a racial minority; (2) [he] was subjected to adverse job action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [he] was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006).  In *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984), the Eleventh Circuit Court of Appeals held that a plaintiff can establish that an employer treated similarly-situated employees outside his protected class more favorably by showing either he was "replaced by one outside the protected class;" or, that he was disciplined more harshly than one outside the protected class for nearly identical conduct.  *Nix*, 738 F.2d at 1185; *see also Burke-Fowler*, 447 F.3d at 1323

("When a plaintiff alleges discriminatory discipline, to determine whether employees are

similarly situated, [the court] evaluates 'whether the employees are involved in or accused

of the same or similar conduct and are disciplined in different ways.'")(quoting *Maniccia*

*v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  However –

> Where the racial discrimination is alleged in the application of work rules to
> discipline an employee, and where there is no claim that the employee did
> not violate the work rules, as here, then plaintiff must show that he engaged
> in misconduct similar to that of a person outside the protected class, and . . .
> the disciplinary measures enforced against him were more severe than those
> enforced against the other persons who engaged in similar misconduct.

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1276 (11th Cir. 2008)(internal citations and

quotations omitted).

Because LSCC replaced Jennings with a white coach, defendants have assumed,

for the purpose of their Summary Judgment Motion only, that Jennings can establish a

prima facie case of race discrimination.  Therefore, the court assumes plaintiff has

establish a prima facie case of race discrimination based on his suspension and the non-

renewal of his contract.  *See Crawford*, 529 F.3d at 976 (assuming prima facie case).

### c.  Articulated Non-Discriminatory Reasons

Defendants' contend LSCC suspended Jennings and did not renew his contract

because:  (1) "Jennings admittedly allowed unauthorized individuals to charge the college

for gas purchases;" (2) Dr. Ward had received reports that Jennings did not follow proper

business office procedures and the Vice President responsible for that office believed he

was untruthful; (3) he had "scheduled an excessive number of games on the conference's

schedule;" (4) he had "disobeyed a directive from Ward not to allow other teams to use the field;" (5) he had "not timely provide[d] information regarding player eligibility to the administration, and [he had] utilized players whose names had not been submitted [to the NJCAA,]" thus violating conference rules; (6) Dr. Ward had received reports that Jennings cancelled a game with another college and misrepresented the reason for the cancellation to the other coach; (7) Dr. Ward had received complaints from the conference commissioner that LSCC baseball players had physically and verbally abused umpires; and (8) "Dr. Ward [had] received a report from the team bus driver that the players were regularly disrespectful and used abusive language."  (Doc. 29 at 18.)

These reasons are sufficient to carry LSCC's burden of production.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)(To satisfy its burden, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.")

### d.  Pretext

Jennings contends that there is "a great deal of evidence from which a reasonable fact finder could infer discriminatory intent from defendants' actions."  (Doc. 41 at 15.) According to Jennings, "[a]ll of defendants' alleged 'legitimate reasons' lack support or credibility."  (*Id.*)  The court disagrees.

"A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the

employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Plaintiff argues that defendant's "proffered explanation is unworthy of credence."  Therefore, the relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).[8]

   "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted); *see Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997)(Evidence of a pretextual explanation can be established by showing "that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the [employment decision]; or (3) insufficient to motivate the [employment decision].").   Also, a plaintiff cannot show pretext by presenting evidence that the

---

   [8] Although *Combs* addressed judgment as a matter of law and not summary judgment, the analysis is the same under both procedural devices. *Combs*, 106 F.3d at 1534 n.8.

defendant "was mistaken about facts upon which he based his alleged nondiscriminatory decision. Instead a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which allegedly based his nondiscriminatory decision." *Woodward v. Fanboy, LLC*, 298 F.3d 1261, 1265 (11th Cir. 2002); *Combs*, 106 F.3d at 1543 ("a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer"). "Federal courts do not sit to second-guess the business judgment of employers." *Combs*, 106 F.3d at 1543.

"If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).

In this case, Jennings's arguments primarily call into question the wisdom of LSCC's decisions and/or he challenges Dr. Ward's honest belief in his perception of the facts underlying the employment decisions. He does not meet LSCC's articulated reasons head-on and rebut them.

First, Jennings states that he took full responsibility for the unauthorized use of the college's credit card, and, although he offered to repay the charges, he was never asked to reimburse LSCC for the purchases. (Doc. 42, Ex. 16 at ¶ 7.) Jennings contends that because "Dr. Ward would not respond to [his] letter" and LSCC did not require

reimbursement of the unauthorized charges, this reason is unworthy of credence.  (Doc. 41 at 19.)  Neither Dr. Ward's lack of response nor LSCC's decision not to pursue reimbursement supports an inference that Dr. Ward was not motivated to suspend and/or terminate Jennings because of this incident. These facts are not inconsistent with his decisions and, when considered in light of the other, articulated reasons, are not insufficient to support the decision.

Citing Dr. Ward's deposition testimony, Jennings also argues, "[S]imilar conduct has occurred in the past by other employees of LSCC and no other employee has been terminated for the conduct."  (Doc. 41 at 15-16 [citing doc. 40, Ex. 2 at 201-02].)  Dr. Ward testified only to that he was "sure" Jennings was not the only LSCC employee that had someone else use their card without permission.  (Doc. 40, Ex. 2 at 201-02.)  Dr. ward did not provide any specific examples of such incidents; therefore, his testimony is of limited relevance to this case.

The court finds that Jennings has not presented sufficient evidence to demonstrate that this reason for suspending him and/or not renewing his contract is unworthy of credence.

Second, Jennings disputes the accuracy of Dr. Ward's recollection of events surrounding the purchase of baseball uniforms in Fall 2005.  (*See* doc. 41 at 19-20; doc. 40, Ex. 2 at 210-18.)  The record supports Jennings's contention that he submitted a requisition form for uniforms; he does not dispute that he contacted vendors directly. (Doc. 40, Ex. 7, exs. 33 and 34.)

> Where, as here, the decisionmaker . . . does not have personal knowledge of
> the work rule violation, but rather relies on second-hand information that an
> employee committed the violation, . . . an employee cannot demonstrate
> pretext merely by showing that the work rule violation did not occur and
> that, therefore, the information relied upon by the decisionmaker is false.
> That is because, in cases where the decisionmaker does not witness the
> alleged infraction, an employer who fires an employee under the mistaken
> but honest impression that the employee violated a work rule is not liable
> for discriminatory conduct.  In other words, whether or not a plaintiff
> actually committed the work rule violations is immaterial on the issue of
> pretext.  Rather, what is material is whether or not the employer believed
> the allegations to be true, not whether they were in fact true.

*Sweeney v. State of Ala. Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272-73

(M.D. Ala. 2000)(citing, *inter alia*, *Damon v. Fleming Supermarkets of Florida, Inc.*, 196

F.3d 1354, 1363 (11th Cir. 1999); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470

(11th Cir. 1991))(internal citations and quotations omitted).

There is no record evidence that Dr. Ward did not believe that Jennings breached

college policy by contacting vendors directly, (*id.*, Ex. 2 at 215), or that he had credited

Crews's report that Jennings failed to fully follow requisition procedures.  (*Id.* at 210-15.)

He also noted that, in the fifteen years of her employment, he had never seen Crews more

upset with an employee than she was with Jennings.  (*Id.*)  Proof that Dr. Ward was

mistaken about the facts surrounding Jennings's order and purchase of uniforms does not

demonstrate this reason is unworthy of credence because, under the circumstances, Dr.

Ward's mistake does not support a inference that he has been untruthful.

Jennings's third attempt to show pretext fails for the same reason.  Jennings claims

that a computer malfunction led to the creation and publication of a team schedule that

violated NJCAA rules.  (Doc. 41 at 20; doc. 40, Ex. 1 at 137-39.)  Also, he testified that

he quickly corrected the error.  (Doc. 42, Ex. 16 ¶ 10.)  Even assuming this is true, which

the court must in the absence of controverting evidence, Jennings does not rebut Dr.

Ward's testimony that he believed the error – on a "fairly basic and fundamental task" –

was Jennings's fault and not a "system-wide computer glitch."  (Doc. 40, Ex. 2 at 338-

39.)  *Chapman*, 229 F.3d at 1030 (citing *Elrod*, 939 F.2d at 1470) (limiting inquiry of

management's mistaken belief to "whether the employer gave an honest explanation of its

behavior")).  Without evidence that Dr. Ward should have known the error was not

Jennings's fault, plaintiff cannot show this reason is unworthy of credence.

     Fourth, Jennings argues that he followed Dr. Ward's instructions regarding

Wenonah High School's use of the field, and merely provided Douglas, Shields and Dr.

Ward with available dates; thus, Dr. Ward's claim of insubordination is unfounded.

(Doc. 41 at 21.)  Dr. Ward testified that he "specifically remember[s]" telling Jennings

"not to have anyone use the baseball field."  (Doc. 40, Ex. 2 at 117-18.)  Jennings

disputes this testimony and testified that Dr. Ward told him to find dates for Wenonah

High School to use the field.  (*See* doc. 42, Ex. 16 ¶ 5.)

     "[A] plaintiff [can] establish pretext by demonstrating that the work rule violation

did not occur . . . in cases where the decisionmaker observes the alleged work rule

violation and, thus, has personal knowledge thereof."  *Sweeney*, 117 F. Supp. 2d at 1272

(citing *Damon*, 196 F.3d 1354, 1363).  Because  plaintiff's testimony contradicts Dr.

Ward's testimony regarding Dr. Ward's instructions to Jennings, the court finds that

Jennings has presented sufficient evidence to allow a reasonable factfinder to determine this articulated reason is unworthy of credence.  However, because this is the only reason that plaintiff has been able to show a question of fact regarding its credence, he has not established his discrimination claims for purposes of summary judgment.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997)([A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of ***each*** of the employer's proffered reasons for its challenged action.").

Fifth, regarding the issue of player eligibility, the record reveals that, among the various departments, confusion abounded as to the exact procedures and various employee responsibilities for complying with the NJCAA eligibility rules.  Jennings contends that he timely provided information regarding his players' eligibility, and that any problem with the players' eligibility was the fault of the Athletic Director or the Registrar's Office.  (*See* doc. 41 at 21-22.)  However, this evidence is not sufficient to show that Dr. Ward was not truthful about his reliance upon Cooks's report regarding Jennings and/or his blaming Jennings for allowing his ineligible players to participate in conference games.  *See Sweeney*, 117 F. Supp. 2d at 1272-73.

Sixth, in his Brief in opposition to defendants' Motion for Summary Judgment, Jennings challenges what and when Dr. Ward knew about the allegation that Jennings cancelled a scheduled game with Calhoun Community College and misrepresented the reason to its coach.  (Doc. 41 at 22.)  The heart of Jennings's argument appears to be that

32

"Douglas'[s] suspect memo and Ward's unsupported, suspect reason," (doc. 40, Ex. 2, ex. 23 at 00052), which were submitted as part of LSCC's EEOC Position Statement, are inconsistent with other record evidence that supports Jennings's assertion that LSCC played two games against Calhoun on February 29, 2006.  Jennings contends that because the parties dispute whether the game was played, a genuine issue of material fact precludes judgment as a matter of law.  (Doc. 41 at 22.)

In his deposition, Jennings testified that he had cancelled the game against Calhoun because the field was too wet and that he had practiced on the field that same day.  (Doc. 40, Ex. 1 at 146-47.)  Regardless of the record document showing that two games had been played against Calhoun on February 29, 2006, the court finds that plaintiff has conceded the accuracy of the Calhoun College complaint.

Jennings asserts that Douglas's memo, recounting his conversation with Calhoun's coach to Dr. Ward, post-dates his suspension, and, thus, Dr. Ward could not have relied on the complaint as a reason for his suspension.  The record is not clear that Dr. Ward relied on the Calhoun College complaint as a reason for suspending plaintiff.  It is clear that Dr. Ward had the complaint ten days before he decided not to renew plaintiff's contract.  The record does not show that Dr. Ward had reason to suspect that the game against Calhoun was actually played or to otherwise doubt the complaint.  Therefore, the court finds that Jennings has not shown that this reason for not renewing his contract is unworthy of credence.  To the extent this information was received by Dr. Ward after he suspended Jennings, the court has not considered the reason as motivating that decision.

Seventh, Jennings asserts that there is no evidence upon which Dr. Ward could have believed that the baseball players had engaged in the complained of behavior at the Snead State game.  (Doc. 41 at 23-24.)  Jennings challenges LSCC's "'legitimate business reason' for suspending and firing [him]" based on these complaints because Dr. Ward did not investigate the complaints and that he made his suspension decision "solely on a suspect, inconclusive email."  (*Id.* at 23-24.)  Jennings also points out that, after speaking to the Snead State coach, Douglas determined that it was "not clear cut" that LSCC players or Jennings had thrown the rock at the umpire.  (Doc. 40, Ex. 5 at 69-70.)  However, Douglas, who was not the decision maker, investigated the incident "on his own."  (Doc. 41 at 23.)  The record reflects that Dr. Ward did not discuss the incident with Douglas; rather, Dr. Ward talked to Commissioner Cox to confirm the report.  (*See* doc. 40, Ex. 2 at 225-26, 233.)  Even if Dr. Ward's belief that the incident took place was mistaken, the key inquiry is whether he believed the report to be true.  And with respect to the Snead State complaints, nothing in the record indicates that Dr. Ward did not believe the umpires' complaints.

As to the last of defendants' articulated reasons, the complaints of the bus drivers about the players use of profanity on the bus, Jennings argues defendants have not documented the bus driver's complaints.  (Doc. 41 at 24.)  However, Jennings does not dispute that his players repeatedly used profanity.  To establish that Dr. Ward's reason for suspending and not renewing plaintiff's contract based on the disparate treatment of Douglas, who is African-American, plaintiff must show not only that Douglas's players

34

cursed, but also that Dr. Ward had received reports about the basketball players cursing and that he had failed to take any action.  Evidence that other players used profanity is insufficient to show this articulated reason is a pretext and that real reason for plaintiff's suspension and nonrenewal was his race.

As outlined above, Jennings has attempted to show that each of LSCC's reasons for his discharge were a pretext for discrimination because the complained of incidents either never happened or were not attributable to plaintiff.  However, Jennings has not shown that Dr. Ward, the sole decisionmaker, has lied about the reasons for his decisions to suspend Jennings and then to not renew his contract.  And that is the key inquiry.  *See Sweeney*, 117 F. Supp. 2d at 1273 (citing *Elrod*, 939 F.2d at 1470) ("[W]hat is material is whether or not the employer believed the allegations to be true, not whether they were in fact true.").  "[I]n view of all the evidence, [Jennings has not] cast sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [Lawson State's] proffered 'legitimate reasons were not what actually motivated its conduct."  *Combs,* 106 F.3d at 1538 (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).[9]

_____

[9]Plaintiff also argues that LSCC's disparate treatment of Steve Johnson following the revelation of his taking payments from a contractor shows that LSCC's reasons for his suspension and non-renewal are unworthy of credence.  He argues that Dr. Ward gave Steve Johnson an opportunity to explain his actions – and Steve Johnson had admitted to illegal acts – before being placed on leave with pay pending an investigation.  (Doc. 41 at 24.)  Dr. Ward's investigation of Steve Johnson lasted six months and was conducted by outside counsel.  (*Id.* at 24-25.)  Jennings, however, contends that he never had an opportunity to explain himself to Dr. Ward prior to his suspension and that he never enjoyed the benefit of a full-length investigation into the claims made against him and

Therefore, the court finds that defendants' Motion for Summary Judgement is due to be granted and plaintiff's Title VII race-discrimination claim against defendant LSCC will be dismissed.

### 2.    Retaliation

"Title VII's anti-retaliation provision forbids actions by an employer that 'discriminate against' an employee because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e-3(a)).   To establish a prima facie case of retaliation under this provision, a plaintiff must show that  (1) he engaged in an activity protected by Title VII; ( 2) he suffered an adverse employment action; and (3) there was some causal relation between the two events.  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).  "The challenged action must be materially adverse from the standpoint of a reasonable employee." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n. 52 (11th Cir. 2008) (citing *Burlington N.*, 548 U.S. 53).   To show a causal connection between the adverse action and the employee's protected conduct, "the plaintiff must

─────────────────────────

outside counsel was never involved.  (*Id.* at 24-25.)  This court finds that Steve Johnson and plaintiff are not similarly situated.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1273-74 (11th Cir. 2004)("When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race since different treatment of dissimilarly situated persons does not violate civil rights laws.")(citing, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998); quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987))(internal citations and quotations omitted).

prove 'that the protected activity and the adverse action are not completely unrelated.'"

*Id*. (quoting *Wideman v. Wal-Mart Stores, Inc.*, 1414 F.3d 1453, 1454 (11th Cir. 1998)).

While the causal link requirement is interpreted broadly, *EEOC v. Reichhold Chem., Inc.*,

988 F.2d 1564, 1571 (11th Cir. 1993), "merely showing that the alleged adverse action

occurred sometime after the protected expression does not establish the causation

element–for temporal progression to be enough, the events must be in 'very close'

proximity." *Davis*, 516 F.3d at 978 n. 52.

> As with claims of race discrimination –
>
> Title VII retaliation claims require that once the plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action.  If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation.

*Crawford*, 529 F.3d 961 at 976 (quotations omitted).

For purposes of deciding defendants' Motion for Summary Judgment, the court

assumes that Jennings can establish a prima facie case of retaliation.  For the reasons set

forth *supra*, the court finds that plaintiff has not shown that the articulated reasons for his

suspension and the non-renewal of his contract are a pretext for retaliation.  Therefore,

defendants' Motion for Summary Judgement will be granted and plaintiff's Title VII

claim alleging retaliation against LSCC will be dismissed.

**B.  SECTION 1983 – EQUAL PROTECTION AND SECTION 1981
DISCRIMINATION AND RETALIATION CLAIMS**

Jennings's Complaint contains claims against Dr. Ward and Steve Johnson, individually, and Dr. Ward and Byrne, in their official capacities, for race discrimination and retaliation asserted through § 1983.  Section 1983 provides:  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  Section 1983 provides the exclusive federal remedy against a state actor for the deprivation of any Constitutional right or right secured by federal law – including race discrimination and retaliation in violation of § 1981 and the Equal Protection Clause of the Fourteenth Amendment.  *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735 (1989); *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991).

In this Circuit, "[D]iscrimination claims, including hostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework."  *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009)(citations omitted).  The court "need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims."  *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

Therefore, the court adopts its prior discussion of plaintiff's Title VII claims as grounds for granting defendants' Motion for Summary Judgment.  Jennings's remaining § 1983 claims, based on violations of the Equal Protection Clause and § 1981, will be dismissed.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order granting defendants' Motion for Summary Judgment, (doc. 28), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 31st day of March, 2010.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE